DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

CHRISTINA PAYLAN,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2022-0304

_____

December 11, 2024

BY ORDER OF THE COURT:

Upon consideration of appellant's motion for rehearing, motion for rehearing en banc, request for certification and/or for written opinion, filed on June 12, 2024,

IT IS ORDERED that the motion for written opinion is granted to the extent that the opinion dated January 17, 2024, is withdrawn and the attached opinion is substituted therefor. Appellant's motion for rehearing, motion for rehearing en banc, and request for certification are denied.

No further motions for rehearing will be entertained in this appeal.

I HEREBY CERTIFY THE FOREGOING IS A
TRUE COPY OF THE ORIGINAL COURT ORDER.

MARY ELIZABETH KUENZEL, CLERK

DISTRICT COURT OF APPEAL OF FLORIDA
SECOND DISTRICT

_____

CHRISTINA PAYLAN,

Appellant,

v.

STATE OF FLORIDA,

Appellee.

No. 2D2022-0304
_____

December 11, 2024

Appeal from the Circuit Court for Hillsborough County; Kimberly K. Fernandez, Judge.

Christina Paylan, pro se.

Ashley Moody, Attorney General, Tallahassee, and Alicia M. Winterkorn, Assistant Attorney General, Tampa, for Appellee.

PER CURIAM.

Christina Paylan appeals from the final order rendered January 18, 2022, denying her claims for postconviction relief brought under Florida Rule of Criminal Procedure 3.850. With the benefit of thorough briefing and oral argument and after careful review of the voluminous record, we affirm.

## 1. Background

Formerly a licensed physician, Paylan owned a plastic surgery practice in Tampa. On June 13, 2011, Carole Morales, accompanied by her husband, Louis Morales, had an initial consultation with Paylan

regarding various cosmetic procedures. Paylan gave the Moraleses an initial cost estimate and created a patient file, which included a patient history form that Carole had completed and copies of Carole's driver's license and health insurance card. A few days later, Paylan sent the Moraleses a formal cost estimate that exceeded the initial estimate by thousands of dollars.

At trial, the Moraleses testified that because the formal estimate exceeded their budget, they did not commit to moving forward with the procedures and that after Louis saw an unflattering newspaper article about Paylan about a week later, they decided against having Paylan perform any procedure at all. Louis testified that sometime in late June, he spoke with Paylan over the phone and told her that Carole would not be undergoing any procedure at her office.

On July 1, Paylan went to Habana Hospital Pharmacy and presented a prescription for Demerol[1] bearing Carole's name along with copies of Carole's driver's license and insurance card. The pharmacy, however, did not fill that prescription, and about four months later, Paylan was arrested and charged with attempting to obtain a controlled substance by fraud and criminal use of personal information. She also faced similar charges in an unrelated prosecution involving another patient.

Paylan represented herself at various points in both cases and proved to be an unusually adept pro se advocate. During the initial Morales prosecution, she filed motions, deposed witnesses, and demonstrated an understanding of the rules of criminal procedure,

---

[1] Demerol is an opioid used for the treatment of moderate to severe pain. *Demerol Vial - Uses, Side Effects, and More*, WEBMD, https://www.webmd.com/drugs/2/drug-3914/demerol-injection/details (last visited Nov. 4, 2024).

ultimately causing the State to dismiss the case after it was unable to obtain a continuance. In the other criminal case, she obtained a dismissal of all charges on speedy trial grounds in 2013. In April 2014, however, the State refiled the charges involving Carole.[2]

At a pretrial hearing on those charges, Paylan appeared pro se and stated that she had not yet decided whether to hire counsel for the trial that was to begin ten days later. The trial court conducted a *Faretta*[3] inquiry, confirming that if she were to proceed pro se, she would be doing so knowingly and voluntarily and with an awareness of the dangers and disadvantages. Further, the court warned Paylan that it would not grant a continuance if she decided to retain trial counsel.

### a. The Trial

Nonetheless, Paylan did retain trial counsel: William Barzee. As framed in its opening statement, the defense's theory at trial was that although Paylan had gone to Habana Pharmacy on July 1, 2011, to fill a prescription for Demerol, that prescription had been for a patient other than Carole Morales. Barzee asserted that Paylan routinely filled prescriptions at Habana Pharmacy for Demerol for her surgical patients but that she had never attempted to fill a prescription there for Carole Morales, nor had she ever submitted copies of Carole's driver's license or insurance card to the pharmacy's staff.

The State presented testimony from three Habana Pharmacy employees.[4] Barzee cross-examined them extensively, challenging their

---

[2] The State also charged Paylan in that case with attempted trafficking but dismissed that charge before trial.

[3] *Faretta v. California*, 422 U.S. 806 (1975).

[4] Although there is also some surveillance video of Paylan's visit to the pharmacy, the video cuts off before Paylan can be seen handing anything discernable to pharmacy employees.

recollections that Paylan had indeed submitted a prescription for Carole and suggesting that they had coordinated their testimony at a pretrial meeting.[5]

The State also called Carole and Louis, who both testified that they had had an initial consultation with Paylan, that they had had doubts about proceeding because of the cost, and that the newspaper article had put the kibosh on the whole idea. Carole testified that she had never scheduled any procedures with Paylan. Louis went a step further and testified that shortly after seeing that article, he had called Paylan and told her they would not be going through with any procedures. Louis testified that this was his final call to Paylan and that although Paylan had continued to call him and his wife in early July, he had returned none of those calls.

After the State rested, the court inquired whether Paylan intended to testify in her own defense. Paylan confirmed that she understood her right to testify, that she understood that the decision whether to testify was solely her own, and that if convicted, she would not later claim that trial counsel had prevented her from testifying. The defense ultimately rested without calling any witnesses.

Consistent with his opening statement and the general theme running through his cross-examination of the Habana Pharmacy employees, Barzee argued in closing that the prescription Paylan had submitted that day was not for Carole Morales. The jury rejected that

_____

[5] This defense was consistent with Paylan's insistence that the offense had been manufactured by case agent Brian Bishop, who, she asserted, had obtained the damning copy of Carole's prescription not from the Habana Pharmacy employees but directly from Paylan's internal patient files through a contact at the Department of Health.

4

theory, finding Paylan guilty on both counts. On direct appeal, we affirmed the judgment and Paylan's 364-day sentence.[6]

### b. The Postconviction Proceedings

At the charge conference, Barzee had requested that the jury be instructed that pursuant to section 893.05, Florida Statutes (2013), "[a] practitioner, in good faith and in the course of his or her professional practice only, may prescribe, administer, dispense, mix or otherwise prepare a controlled substance." Barzee objected, however, to the trial court's decision to then further instruct the jury that Paylan bore the burden of establishing good faith rather than the State bearing the burden of establishing lack of good faith as part and parcel of its burden to show the requisite intent. The court overruled the objection and gave both instructions seriatim.

Paylan, however, argues that this is the defense that Barzee should have pursued all along, i.e., that the submitted prescription *had* been written for Carole Morales but that as a doctor, Paylan had been legally authorized to submit it because she had done so in a good faith belief that Carole intended to go forward with surgery. Paylan thus sought postconviction relief on numerous claims. The postconviction court summarily denied some claims but held an evidentiary hearing on several claims of ineffective assistance of counsel—including claims premised on Barzee's failure to move for a trial continuance, the theory of defense he presented at trial, and his failure to present any evidence—

---

[6] *Paylan v. State*, 208 So. 3d 709 (Fla. 2d DCA 2016) (table decision).

5

and on a claim of a *Brady*[7] violation.[8]  Ultimately, however, the postconviction court denied all of Paylan's claims for relief.

With respect to her ineffective assistance of counsel claims, Paylan testified that Barzee had hustled her to trial despite her concern that she should request a continuance to give him time to review all the discovery. Barzee, she claimed, had assured her that a continuance was unnecessary and that obtaining one would work to the State's benefit. Further, Paylan testified that she had informed Barzee that she had already arranged for several witnesses to testify on her behalf—another cosmetic surgeon, a member of her office staff, and a forensic computer expert—and that Barzee had assured her that he would in fact call those witnesses.

Although acknowledging that she had told Barzee that she had not submitted a prescription for Carole Morales at Habana Pharmacy, Paylan testified that Barzee had never discussed any defense strategy with her, let alone the theory of defense ultimately pursued at trial.  Additionally, Paylan testified that after the State had rested, Barzee had told her that the State had not proven its case and that there was no need to put on any evidence.  Based on this advice, Paylan claimed, she had waived her right to testify in her own defense.

---

[7] *Brady v. Maryland*, 373 U.S. 83 (1963).

[8] Paylan filed an amended motion for postconviction relief in 2017. At the evidentiary hearing on certain claims raised in that motion, Paylan moved to disqualify the postconviction judge.  That judge denied Paylan's motion for disqualification, and Paylan petitioned this court for a writ prohibiting that judge from presiding further.  While the petition was pending, the postconviction judge denied Paylan's amended motion.  We subsequently granted Paylan's petition, *Paylan v. State*, 263 So. 3d 23 (Fla. 2d DCA 2019), and the successor postconviction judge granted Paylan a new evidentiary hearing on many of her claims.

Barzee's testimony significantly conflicted with Paylan's. Although unable to recall details of his early interactions with Paylan, Barzee nonetheless recounted their discussing several key decisions leading up to trial and jointly deciding critical aspects of her defense strategy. For example, Barzee testified that he and Paylan had considered each potential witness's anticipated testimony, whether that testimony would fit into their theory of defense, and how the State might challenge each witness's credibility or conclusions. He insisted that he and Paylan had discussed the pros and cons of requesting a continuance and that given their mutual concern that any delay would allow the State a chance to file a notice of intent to rely on *Williams*[9] rule evidence, they had jointly agreed to push through to trial. Significantly, Barzee repeatedly testified that Paylan had been convinced that *Williams* rule evidence would "sink her case."[10] Further, he recounted discussing with Paylan all possible defense theories and that they had jointly landed on the one that he ultimately had pursued.

---

[9] *Williams v. State*, 110 So. 2d 654 (Fla. 1959).

[10] We note that regardless of whether the State had moved pretrial to introduce such evidence in its case-in-chief, such evidence would have been admissible to rebut any defense that put Paylan's intent squarely at issue. *See* § 90.404(2)(d)1, Fla. Stat. (2012) ("No notice is required for evidence of offenses used for impeachment or on rebuttal."); *see also Gosciminski v. State*, 132 So. 3d 678, 696 (Fla. 2013) ("[N]o notice is required for evidence of offenses used for impeachment or on rebuttal." (citing § 90.404(2)(c)1, Fla. Stat. (2009))); *Gillig v. State*, 356 So. 3d 260, 266–67 (Fla. 4th DCA 2023) ("[Rebuttal] evidence 'is permitted to refute a defense theory or to impeach a defense witness.' " (quoting *Rimmer v. State*, 825 So. 2d 304, 321 (Fla. 2002))); *Harden v. State*, 87 So. 3d 1243, 1246 (Fla. 4th DCA 2012) ("[E]vidence of other crimes is admissible where such evidence 'tends to disprove a defendant's theory of defense or attempt to explain his intent.' " (quoting *Gould v. State*, 942 So. 2d 465, 467 (Fla. 4th DCA 2006))).

7

With respect to the asserted *Brady* violation, Paylan claimed that the State had concealed an agreement that it had struck with the Moraleses: in exchange for their damaging testimony, the State would consider reducing the fifteen-year sentence that Louis Morales, Jr. (Morales, Jr.)— Louis's adult son from his prior marriage to Ruth Caballero—had already begun serving in an unrelated case. In support of this claim, Paylan presented testimony from Caballero and her daughter, Amber Albelo, who is Morales, Jr.'s half-sister.

Caballero testified that Louis repeatedly had assured her that Morales, Jr., would receive a lesser sentence if Louis testified favorably for the State in Paylan's trial.[11] Albelo testified that Louis had hired Morales, Jr.'s lawyer, Nicholas Matassini, and that in Matassini's presence, Louis had assured her and Caballero that he and Matassini had things under control.

After Paylan's trial, Morales, Jr.'s sentence was in fact reduced from fifteen years' imprisonment to five years' imprisonment. Testifying at Paylan's postconviction evidentiary hearing, however, Matassini denied being present for any conversation involving Caballero, Albelo, and Louis and denied knowledge of any understanding between Louis and the State regarding Morales, Jr. He testified that after Morales, Jr., had been convicted and sentenced, he had filed a motion for mitigation of Morales, Jr.'s sentence, but it was not until August 21, 2014—the day before the hearing on that motion—that he had learned for the first time about the Moraleses' involvement in Paylan's criminal case. Only then had he contacted the State and requested that their cooperation in Paylan's case

---

[11] The successor postconviction judge determined that Caballero was unavailable to testify at the successive evidentiary hearing, and she therefore admitted into evidence Caballero's testimony from the evidentiary hearing before the original postconviction judge.

be considered in conjunction with Morales, Jr.'s motion for mitigation of sentence. Assistant State Attorney Christian Tsoubanos, who had prosecuted Morales, Jr., at trial, was copied on that email.

Matassini testified that on the day of Morales, Jr.'s mitigation hearing, Tsoubanos had briefly spoken with him and Morales, Jr., before the motion was called up, inquiring into Morales, Jr.'s time in prison and what plans he had upon release. Tsoubanos, in short, testified that his decision not to oppose Morales, Jr.'s motion for mitigation had turned on that conversation with Matassini and Morales, Jr., and on reservations that he had had about Morales, Jr.'s sentence since its imposition, not on the Moraleses' cooperation in Paylan's prosecution.

## 2. Discussion

Paylan raises eleven main issues on appeal. The majority of those, even when couched in terms of legal error, would require this court to reevaluate various credibility determinations by the postconviction court. Indeed, we note that credibility has been at the core of most, if not all, of Paylan's challenges to her conviction and to its collateral consequences.[12]

_____

[12] Paylan has pursued legal action against virtually every entity and individual even tangentially involved in the criminal proceedings and the resulting fallout. See, e.g., *Paylan v. State*, 108 So. 3d 1095 (Fla. 2d DCA 2012) (successfully petitioning for writ prohibiting trial judge from further presiding over initial case); *Paylan v. Dep't of Health*, 160 So. 3d 936 (Fla. 1st DCA 2015) (seeking certiorari review of the Florida Department of Health's suspension of Paylan's medical license); *Paylan v. Brown*, 207 So. 3d 877 (Fla. 2d DCA 2015) (petitioning for writ prohibiting trial judge from presiding further in civil case against Assistant State Attorney Christine Brown); *Paylan v. Fla. Bd. of Med.*, No. 8:15-cv-2817-T-33MAP, 2015 WL 8265595 (M.D. Fla. Dec. 9, 2015) (denying Paylan's emergency motion for temporary restraining order in suit brought under 42 U.S.C. § 1983 against Florida Board of Medicine, Department of Health, and two doctors in their individual capacities following Paylan's suspension by Florida Board of Medicine); *Paylan v. Morales*, 229 So. 3d 337 (Fla. 2d DCA 2016) (denying petition for writ of

The recurring theme in all her challenges, from the initial investigation to date, has been that someone on the other side or in cahoots with the other side is lying, whether out of personal animus, for personal gain, or to cover their own incompetence.

But even if she were right, it would not be our role to "fix" it. We may not be swayed by concerns of factual guilt or innocence. Nor may we decide the credibility of witnesses. To the contrary, we are affirmatively precluded from doing those things. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 763 (1946) ("[I]t is not the appellate court's function to determine guilt or innocence." (citing *Weiler v. United States*, 323 U.S. 606, 611 (1945))); *Lambrix v. State*, 39 So. 3d 260, 268 (Fla. 2010) ("Appellate courts do not 'reweigh the evidence or second-guess the circuit court's findings as to the credibility of witnesses.' " (quoting *Nixon v. State*, 2 So. 3d 137, 141 (Fla. 2009))); *Wait v. State*, 212 So. 3d 1082, 1085 (Fla. 1st DCA 2017) ("This Court will not substitute its judgment for that of the post-conviction [sic] court on questions of fact, the credibility of witnesses, or the weight given to the evidence."). Instead, our role here is limited to reviewing whether competent substantial evidence supported the postconviction court's findings of fact and to reviewing de novo its

---

prohibition stemming from lawsuit against Carole and Louis Morales); *Paylan v. Teitelbaum*, No. 1:15-cv-159-MW-GRJ, 2017 WL 11490055 (N.D. Fla. May 30, 2017) (denying Paylan's motion for sanctions in § 1983 suit brought against Dr. Scott Teitelbaum, University of Florida, and UF & Shands Florida Recovery Center); *Paylan v. Fitzgerald*, 223 So. 3d 431, 432–33 (Fla. 2d DCA 2017) (granting petition for writ of certiorari and quashing interlocutory discovery order in legal malpractice case against lawyer and law firm "with respect to their representation of her in several criminal cases"); *Paylan v. Dirks*, 847 Fed. App'x 595 (11th Cir. 2021) (affirming partial dismissal and partial summary judgment of her complaints against the City of Tampa, Assistant State Attorneys Brown and Darrell Dirks, and other law enforcement officials).

conclusions of law.  *See Taluy v. State*, 385 So. 3d 627, 629 (Fla. 2d DCA 2024) (quoting *Campbell v. State*, 247 So. 3d 102, 106 (Fla. 2d DCA 2018)).

Having undertaken that role, we find no error.  The postconviction court's well-reasoned, sixty-four-page order (plus attachments) is firmly grounded in both the evidence and the law.  Were we to do anything at this point other than simply affirm, we would be adding nothing to the canon beyond what that court has already correctly invoked.

Affirmed.

SLEET, C.J., and BLACK and ROTHSTEIN-YOUAKIM, JJ., Concur.