LAGOA, Judge.
Defendant, Felix Aguiluz, appeals his conviction and sentence for second-degree murder with a deadly weapon. Defendant argues that the trial court erred in admitting witness testimony regarding a collateral, uncharged crime. For the following reasons, we affirm the conviction and sentence.
I. FACTUAL HISTORY
The victim, Ivetty Mendosa, lived in Miami, Florida, with her nine-year old son, and Carlos Rivera. On the morning of October 2, 2003, Mr. Rivera went to work, and returned that afternoon at around 2:00 p.m. When he attempted to enter the residence through the front door, it was locked, which was unusual. Mr. Rivera began knocking on the door, but received no answer. The next-door neighbor came out and told Mr. Rivera that earlier he had heard fighting inside the house. Rivera continued to knock on the door but received no answer. He noticed, however, that the victim’s vehicle was parked on the street.
*801 While Mr. Rivera was knocking on the front door, he tripped over two items that were on the porch, a cap and a cell phone. Mr. Rivera started looking through the windows of the house, and he saw a great deal of blood on the floor, and saw the Defendant sitting in the chair surrounded by a pool of blood. The Defendant did not respond to Mr. Rivera’s shouts, so Mr. Rivera called the police.
Both the City of Miami Police Department and Fire Rescue responded to the scene. The first officer to respond, Detective Sanchez of the Miami Police Department, testified that after speaking to Mr. Rivera, he looked through the living room window and also saw a great deal of blood. A neighbor told Detective Sanchez that earlier in the day a female had been screaming for help. At that time, Detective Sanchez decided to enter the residence by force.
Once inside, Detective Sanchez saw a male covered in blood and vomit lying on a recliner chair. When Detective Sanchez entered the dining room area, he observed a female motionless on the kitchen floor.
Captain Duthel of the City of Miami Fire Department identified Defendant as the individual found in the chair, and testified that Defendant had multiple cuts on his wrists and a puncture wound to his chest that appeared to have been made with a knife. Defendant, however, was able to get up, walk, and he down on a stretcher. Captain Duthel further testified that he pronounced the victim dead on the scene.
Priscilla Miller, the lead crime scene investigator with the City of Miami Police Department, also testified. While waiting for the search warrant, Ms. Miller processed the exterior of the residence. After the search warrant was obtained, she processed the interior of the residence, and took photographs of the crime scene. Part of the evidence photographed was a phrase in Spanish, “culpable deeto,” written in blood on the floor. Sergeant Morin-Fernandez with the City of Miami Police Department, the lead officer responsible for the homicide investigation, testified that the Spanish phrase, “culpable deeto” meant “guilty of this.”[1]
Yamileth Estrada, the victim’s best friend, testified at trial. Ms. Estrada knew the Defendant from her relationship with the victim. Ms. Estrada testified that the victim and the Defendant had been involved in a relationship, and that after the victim ended it, the Defendant continually tried to reconcile with the victim. Ms. Estrada testified that Defendant had called her and asked her to take good care of his son because if the victim would not reconcile, he would kill her and then kill himself. After the telephone call, Ms. Estrada informed the victim of the conversation.
Three weeks prior to the victim’s death, Ms. Estrada and another friend, Zoraida Madriz, went over to the victim’s house to pick her up. When they arrived at the victim’s residence, Ms. Estrada observed Defendant’s vehicle parked out front. Ms. Estrada began calling out the victim’s name and knocked on the front door. The victim opened the door and the Defendant was behind her. During this portion of the testimony, Defendant objected pursuant to Williams v. State, 110 So.2d 654 (Fla.1959), and the trial court gave the following instructions:
Ladies and gentlemen, the evidence that you are about the [sic] receive concern *802 ing evidence of other crimes allegedly committed by the defendant will be considered by you for the limited purpose of proving motive, or intent, or preparation, or knowledge, or absence of mistake or accident on the part of the defendant, and you shall consider it only as it relates to those issues. The defendant is not on trial for any crime that is not charged in the information.
Ms. Estrada then testified that after the victim opened the door, Defendant told Ms. Estrada that she had come at a very bad time. His tone of voice was upset, and the victim appeared very nervous. Because Ms. Estrada would not leave, Defendant left. After he left, the -victim showed Ms. Estrada her underwear, which was torn, and further showed her a bruise on her leg.
The State’s final witness was Dr. Mark Shuman, an associate medical examiner for Miami-Dade County. Dr. Shuman did not conduct the autopsy on the victim, but reviewed all the reports and testified from those reports that the victim was found face-up in the kitchen with multiple sharp injuries, incised wounds, and probable stab wounds. Specifically, the victim had a stab wound in her chest that was the cause of her fatal injury. She also had two incised wounds on the left side of her chest, three incised wounds in the upper half of her chest, one on her jaw, and one in the back of her head. Additionally, she had bruises, abrasions, and contusions, and one incised wound on her right arm. Her right hand contained bruises and nine incised wounds, and she also had bruises on her left arm and legs.
Dr. Shuman explained that incised wounds are superficial wounds that are longer than deep, while a stab wound is deeper than long. Dr. Shuman testified that some of the bruises could have occurred from the actual cutting of the skin with the knife, and that the injuries to the victim’s hand could have been defensive wounds. He also testified that one of the three knives found on the scene could have caused the injuries, most likely the knife collected from the sink. However, Dr. Shuman could not positively state that a knife caused the injuries, because another sharp object could have also caused the injuries. Finally, Dr. Shuman testified that the injuries could have occurred from two people struggling over a knife, or from a person stabbing the victim, and that, examining the totality of the injuries with the defensive wounds, the injuries are consistent with the victim attempting to defend herself.
After the State rested its case-in-chief, the Defendant moved for a judgment of acquittal, arguing that the State failed to prove second-degree murder and that the evidence only supported a prima facie case of manslaughter. The trial court denied the motion.
Defendant testified in his own behalf. According to the Defendant, he first met the victim in Honduras, when both of them were living there. Eventually, Defendant moved to Miami and purchased a plane ticket for the victim to move to Miami from New York. Around 2000, the victim and the Defendant decided to move to separate residences, but maintained an intimate relationship. After they separated, Defendant still supported the victim financially. After the separation, Defendant kept in touch with the victim’s sister, Deli-la Mendoza. Defendant denied ever threatening the victim during a phone conversation with Ms. Mendoza, or during a phone conversation with Ms. Estrada.
On the day of October 2, 2003, Defendant spoke with the victim by telephone and made plans to meet at her house and to talk. He arrived at her house at 7:30 a.m. He stayed outside the house until she *803 arrived at around 8:15 a.m. Defendant testified that the conversation was about him leaving town for work and the victim’s desire to reconcile and get married. Defendant testified that the victim became upset when the Defendant told her that he was leaving town; he attempted to calm her down, but the victim reached for a knife and attempted to stab the Defendant. Defendant further testified that he was cut on his left breast. Defendant testified that they began to struggle over the knife and that during the struggle, the victim slipped and fell, the Defendant fell on top of her, and the knife plunged into the victim. The victim died and the Defendant testified that he lost control and tried to commit suicide. After cutting himself, the Defendant attempted to write that there was no one to be blamed, but fainted before he could finish writing.
During cross-examination, the Defendant denied that he was extremely jealous and did not want the victim dating other people. However, he did acknowledge that it made him angry when the victim started dating Hector Rivera. Around Christmas, the year before the victim died, Defendant met Mr. Rivera, and Mr. Rivera agreed to “back off’ from dating the victim. Defendant testified that he did not know the extent of the victim’s relationship with Mr. Rivera until Mr. Rivera testified in court during the trial. Defendant testified that he never wanted to reconcile with the victim because they had never broken up. Defendant also denied ever speaking to Ms. Madriz and Ms. Estrada and telling them that they came at an inopportune time. Defendant also denied telling Ms. Estrada that if he found out the victim had a new boyfriend he would kill her and then himself. Defendant further testified that he did not remember how many times the victim was stabbed, but that it was a result of the victim attempting to attack him.
On re-direct examination, the Defendant testified that he was attempting to write “guilty of this is my destiny” and that he was attempting to convey that he accidentally took the life of the woman he loved.
After the Defendant’s testimony, the defense rested. The State did not present a rebuttal case. Defendant again renewed his motion for judgment of acquittal, which the trial court denied.
The jury returned a guilty verdict for second-degree murder with a deadly weapon. The trial court adjudicated the Defendant guilty and sentenced him to twenty years with a twenty-year minimum mandatory sentence. This appeal ensued.
II. ANALYSIS
On appeal, Defendant asserts that the admission of collateral, uncharged evidence deprived him of a fair trial. We review a trial court’s ruling on admissibility of evidence for abuse of discretion. Dennis v. State, 817 So.2d 741, 762 (Fla.2002) (stating “ ‘[a] trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion’ ”) (quoting Sexton v. State, 697 So.2d 838, 837 (Fla.1997)). In this case, we conclude that the trial court did not abuse its discretion in admitting the evidence.
Section 90.404(2)(a), Florida Statutes (2006), codifies the general rule of admissibility of similar fact evidence enunciated in Williams, 110 So.2d at 662-63, as follows:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
*804 See also Zack v. State, 753 So.2d 9, 16 (Fla.2000); State v. Williams, 992 So.2d 330, 333 (Fla. 3d DCA 2008).
We conclude that the testimony of prior incidents was admissible to prove motive, intent and the absence of mistake or accident. See Dennis, 817 So.2d at 762 (finding that collateral evidence that defendant stalked, threatened, and assaulted former girlfriend was admissible; “[a]lthough certainly prejudicial, the evidence of the nature of [the defendant’s] relationship with the victim was relevant to establish [defendant’s] motive”); Nicholson v. State, 10 So.3d 142 (Fla. 4th DCA 2009) (finding that evidence of defendant entering his former wife’s home through a window and accusing her of sexual activity with another man was relevant to prove motive and intent in former wife’s murder), review denied, 22 So.3d 68 (Fla.2009); Burgal v. State, 740 So.2d 82, 83 (Fla. 3d DCA 1999) (holding prior incidents of domestic violence by the defendant against the victim were properly admitted to prove motive, intent, and premeditation in prosecution for attempted first-degree murder); Evans v. State, 693 So.2d 1096, 1102 (Fla. 3d DCA 1997) (finding that prior instances of physical abuse were “properly admitted to prove intent and the absence of mistake or accident” in first-degree murder and aggravated child abuse case; defense was that victim had accidentally fallen off his bunk bed, or that he had received injuries during football games); Brown v. State, 611 So.2d 540 (Fla. 3d DCA 1992) (finding that victim’s testimony was admissible as evidence of motive, intent and premeditation in attempted second-degree murder and battery case; defendant’s victim girlfriend testified that defendant had jealous streak and had threatened to kill her). Accordingly, we affirm the Defendant’s conviction and sentence for second-degree murder with a deadly weapon.
Affirmed.
COPE, J., concurs.

. Sergeant Morin-Fernandez also testified that the correct spelling of the phrase would have been "culpable de esto.”